UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **ANTARES MARITIME PTE LTD.** | * | |
| **On its Own Behalf and as Owner** | * | CIVIL ACTION NO.: 2:18-cv-12145 |
| **of the M/V PAC ANTARES** | * | |
| | * | JUDGE Wendy Vitter |
| **vs.** | * | SECTION (I) |
| | * | |
| **THE BOARD OF COMMISSIONERS** | * | MAGISTRATE |
| **OF THE PORT OF NEW ORLEANS** | * | KAREN WELLS ROBY (4) |
| **and PORTS AMERICA** | * | |
| **LOUISIANA, LLC** | * | |

**************************************

<u>**MEMORANDUM IN SUPPORT OF MOTION FOR SPOLIATION SANCTIONS**</u>

Plaintiff, Antares Maritime PTE Ltd., for itself and as Owner and Claimant of the M/V PAC ANTARES, ("Antares") respectfully submits this Memorandum in Support of its Motion for Spoliation Sanctions, filed concurrently herewith, pursuant to this Court's inherent power to control the discovery process.

I.   **INTRODUCTION**

The accompanying Motion for Spoliation Sanctions is inspired by the Defendant, Board of Commissioners of the Port of New Orleans' ("Dock Board") destruction of critical, physical evidence, before the onset of litigation, but after it was clear that litigation was all but certain. As detailed more fully herein, the Dock Board has shown malfeasance along with clear negligence in its failure to preserve the dilapidated wooden fenders pulled from the berth known as "Nashville A." These fenders were unique and crucial evidence in this case, and without them, Antares faces clear prejudice in the prosecution of its claims. The appropriate sanction for this bad faith behavior is an inference in Antares' favor regarding the spoliated evidence – an inference that the damage and deterioration to these piles pre-dated the April 12, 2018 docking of the PAC ANTARES.

## II.   FACTUAL BACKGROUND

On April 12, 2018, the M/V PAC ANTARES arrived at the Port of New Orleans to discharge her cargo. (*See* Complaint (Doc. 1) at ¶ 10; Ports America's Answer (Doc. 8) at ¶ 10.) She had been directed by the Dock Board to berth at Nashville Avenue Wharf A, sections "A102 – open & Nashville B1-5."[1] Unbeknownst to the PAC ANTARES, however, the Dock Board had knowingly allowed the wooden fender piles at this location to fall into serious disrepair or go missing.  In addition to the substantially compromised fender piles, the Port had installed a continuous row of steel plates which jutted out from the wharf in this exact location. The compromised fenders, together with the sharp steel plates extending out over the water and into the berthing area, created the hazardous condition that caused this incident. Specifically, during docking maneuvers, as the PAC ANTARES slid back along the dock to its assigned position, an exposed corner on one of the steel plates scraped along the vessel's hull, creating a prominent gouge in the shell plating, ultimately puncturing the hull and its starboard bunker tank. This breach resulted in a spill of nearly 2,000 gallons of bunker oil into the Mississippi River. (*Id.* at ¶ 13.)

## III.   FENDERING SYSTEMS – PURPOSE AND FUNCTION

A fundamental purpose of fendering systems is to protect vessels from damage during berthing maneuvers.  There are various designs, but all share common purposes: 1) absorption of berthing energy by compression, 2) distribution of energy as a force through the structure evenly and efficiently, 3) providing a low friction surface to allow vessel movement along the berth, and 4) providing positive clearance from the wharf. By any measure, the Dock Board's fendering system at the incident location failed miserably on all counts.

---

[1] Exhibit A, Email dated 4/6/2018 from Port of New Orleans Operations Manager Patrick Noble to PAC ANTARES agent Newship. (PORTOFNO 01897).

## IV.   NASHVILLE AVENUE WHARF - CONSTRUCTION, EXPANSION AND FENDER DESIGN

### a.   Nashville Avenue Wharf A– Original Construction and 1994 Expansion

Fendering systems have evolved significantly over the past 100 years, with improved designs and materials to accommodate larger vessels, common place in today's marine industry. However, construction plans[2] produced by the Dock Board confirm that the Nashville Avenue wharf – originally constructed circa 1962 – adopted a first generation fendering system comprised of wooden timber piles spaced some 8 feet apart, driven into the seabed and attached to the dock face with a single U-bolt.

The section of the Nashville Avenue wharf where the Dock Board directed the PAC ANTARES to berth[3], B 5 and up, includes an area of the dock that has a series of steel plates designed as a movable curb system to accommodate berthing of ro-ro vessels.[4]  The majority of the Nashville Avenue wharf is configured with horizontal timber beams as the curb, which provide a continuous flat surface that is flush with the edge of the dock.[5]  Those timber beams are not present in the area of the steel ro-ro plates; instead, the steel plates act as the curb.

Indeed the Dock Board's construction plans detail the Port's 1994 Nashville expansion project, including installation of these steel ro-ro plates 20 $\frac{1}{2}$" wide by 8' long and $\frac{3}{4}$" thick which, as designed, extended out over the water some 8" from the wharf face.  Notably, in recognition of the potential hazard created by these steel plates, these plans also contain extensive details and full design schematics for installation of a modern "Revised Fender

---

[2] Exhibit B, (PORTOFNO 0554 to 0558).

[3] The Dock Board's tenant, Ports America, requested that the PAC ANTARES be directed to this berthing location.

[4] Ro-ro stands for a "roll on – roll off" vessel, which is fitted with a ramp that lowers onto the wharf to allow cargo to be driven on and off of the vessel rather than placed onboard using cranes.  Ro-ro vessels calling the Nashville Avenue terminal are exceedingly rare.  The Dock Board did not utilize the ro-ro ramps at the Port of New Orleans for a period of some 12 years between 2005 - 2017. https://www.marinelink.com/news/orleans-bahris-calls429176 (quoting Port of New Orleans President and Ceo Brandy D. Christian).

[5] Exhibit C, Winn Deposition 49:12-14.

System" to be installed along the entire 135' length of the ro-ro area.[6]  Specifically, the plans call for installation of a 5th generation Trellex rubber fender system to be installed in front of the plates.[7]  The Trellex system was designed to provide critical advantages over the antiquated timber piles.

First, as compared with the wooden timber piles, the Trellex system provides substantially greater absorption and distribution of vessel berthing energies, a function of its refined geometry and extensive utilization of rubber at the berth-vessel interface.[8]  Additionally, as designed, the Trellex system would have provided more than twice the positive clearance of the timber piles used by the Dock Board in this area.  The Trellex system was to provide some 28 inches of clearance to the concrete wharf and 20 inches of clearance to the hazardous steel plates.  In stark contrast, the installed timber piles provided only 8 inches of clearance to the steel plates – but only where the timber piles were in as-new condition.  As detailed herein, the piles in this area were in anything but "new condition" when the PAC ANTARES arrived at Nashville.

    b.  Fender Piles at Nashville were Significantly Compromised, and Afforded No Protection

The evidence in this case firmly establishes that the fender piles in the area of the incident were significantly compromised long before arrival of the PAC ANTARES on April 12, 2018. Of the 15 piles that were to serve as the only protection from the protruding steel plates, 12

---

[6] Exhibit B.  Specifically, the plans called for MV400x1500 Trellex-Morse rubber fenders with a 12" x 12" wale beam mounted off the face of the concrete wharf, with 85 timber piles below. (PORTOFNO 554-0558).
[7] Id.  The Dock Board's construction plans show Trellex rubber units spaced every 10', backed by 12"x12" wale beams.
[8] Exhibit D, Trellex Marine Systems, Modular Fenders, Section 2 at 2-3; Deposition of Evett, Exh. 124.

consecutive piles showed severe preexisting damage and deterioration, to include piles that were missing, loose, crushed, fractured and leaning.[9]

In addition to substantially reducing their energy absorption and energy distribution capacity, the deteriorated piles also exhibited substantial compression from their as-new diameter of about 16 inches.[10]  As a result of significant, pre-existing deterioration and damage,[11] the piles in front of the ro-ro plates exhibited, on average, a diameter in the range of only 12 inches." And this significant compression reduced the positive clearance between the vessel and the protruding steel plates down to about 4 inches – a dramatic reduction in clearance, particularly as compared to the 20 inches of clearance that would have been provided by installation of the designed Trellex fender system.[12]

In the face of overwhelming evidence contained within the Dock Board's records and sworn testimony given by its own witnesses,[13] the Dock Board persists with its arguments that the "berth was safe,"  that the condition of the fendering system played no role in this incident, and/or that the damage to the piles was caused solely by the PAC ANTARES.

Specifically, the Port contents that the significant damage/deterioration observed to the piles during topside, post incident inspections was not pre-existing, but rather was caused by contact from the PAC ANTARES.   In support of this position, the Dock Board provides a so called "Wharf Damage Assessment," created after the incident.  The version of the report originally produced in discovery by the Dock Board, sets out a comparative of the condition of 6 piles in the immediate area of the steel ro-ro plates, at three distinct time periods: 1) prior to the

---

[9] Exhibit E, Dock Board Pile Inspection Reports for September 2017 (PORTOFNO 01238), October 2017 (PORTOFNO 01240), November 2017 (PORTOFNO 01242), January 2018 (PORTOFNO 1727); Exhibit F, Expert Report of LOC's Patrick Darjon dated December 18, 2019 at pg.12-13.
[10] Exhibit F, Darjon Report at 6.2.1
[11] *Id.* at 3.32-3.3.5.
[12] *Id.* at 6.1.3.
[13] Exhibit C, Winn Deposition, 31:7 – 32:12.

March 28, 2018 TORENIA[14] incident ("Before 4-3"), 2) after the TORENIA Incident ("after 4-3"), and 3) after the PAC ANTARES berthing ("after 4/12").   As reflected below, this self-serving version of the report – initially produced by the Dock Board in 2018[15] shows substantial damage to the piles following the TORENIA incident, with some additional damage to the piles following the April 12, 2018 PAC ANTARES berthing.

"Pile 1:        1/30/18 - Pile missing (assumed)
                4/3/18  -  Pile missing
                4/21/18 -Pile missing

Pile 2:        1/30/18- Pile broken near water line, pile top not crushed. Condition State 50% damaged
                4/3/18- Pile broken near water line, pile top crushed. Condition State 65% damaged
                4/21/18- Pile broken near water line, pile top crushed. Condition State 75%

Pile 3:        1/30/18- Pile broken near water line, pile top not crushed. Condition State 50% damaged
                4/3/18- Pile broken near water line, pile top crushed. Condition State 65% damaged
                4/21/18- Pile broken near water line, pile top crushed. Condition State 75% damaged

Pile 4:        1/30/18- Pile broken near water line, pile top not crushed
                Condition State 50% damaged
                4/3/18- Pile broken near water line, pile top crushed
                Condition State 75% damaged
                4/21/18- Pile missing

Pile 5:        1/30/18- Pile broken near water line, pile top not crushed. Condition State 50% damaged
                4/3/18- Pile broken near water line, pile top crushed. Condition State 75% damaged
                4/21/18- Pile broken near water line, pile top crushed. Condition State 95% damaged

Pile 6:        1/30/18- Pile broken near water line, pile top not crushed. Condition State 50% damaged

---

[14] The M/V TORENIA sustained similar hull damage from the same hazardous steel ro-ro plates on March 28, 2018. The TORENIA was the last vessel to berth at this location prior to the PAC ANTARES on April 12, 2018.
[15] Exhibit G, (PORTOFNO 0005 – 24).

        4/3/18- Pile broken near water line, pile top crushed. Condition State 65% damaged

        4/21/18- Pile broken near water line, pile top crushed. Condition State 75% damaged

However, in the Dock Board's supplemental production, not received until November 16, 2020,[16] an alternate version of the report tells a very different story. While continuing to show additional pile damage following the TORENIA docking, this report shows that the Port Engineer[17] directed to inspect the piles and create the report concluded that 5 of the 6 piles showed no apparent increase in damage following the April 12, 2018 PAC ANTARES docking. In other words, the piles in front of the steel plates were either missing, crushed or substantially damaged ("75% - 95% damaged") prior to arrival of the PAC ANTARES, as reproduced below.[18]

"It appears that one pile is missing after the second allision. It is also apparent that the pile tops were crushed during the 4-3-18 allision.

Pile 1:        Before 4-3, assumed missing; after 4-3, missing; after 4-12, missing

Pile 2:        Before 4-3, assumed 50% damage, pile top not crushed, 75% damage; after 4-3 pile top freshly crushed; apparently same after 4-12

Pile 3:        Before 4-3, assumed 50% damage, pile top not crushed, 75% damage; after 4-3 pile top freshly crushed; apparently same after 4-12

Pile 4:        Before 4-3, assumed 50% damage, pile top not crushed, 75% damage; after 4-3 pile top freshly crushed; missing after 4-12

Pile 5:        Before 4-3, assumed 50% damage, pile top not crushed, 75% damage; after 4-3 pile top freshly crushed; apparently same after 4-12

Pile 6:        Before 4-3, assumed 50% damage, pile top not crushed, 75% damage; after 4-3 pile top freshly crushed; apparently same after 4-12"

---

[16] Exhibit H, (PORTOFNO 08354 – 08359).

[17] Exhibit I, Booker Deposition 10:15-25; 11:1-14; 15:15-23. Patrick Booker is the Waterfront Maintenance Manager for the Port of New Orleans. He is a licensed engineer, with a degree in Naval Architecture and Marine Engineering. *Id.*

[18] Exhibit H, (PORTOFNO 08354 – 08359).

Other evidence developed in this case lays waste to the Dock Board's narrative:

- As early as September 2017, The Dock Board's pile condition reports confirm that 12 consecutive piles – spanning about 100 feet –in the area of the ro-ro plates (including the 6 contained within their "Wharf Damage Assessment") were either missing, damaged or broken.[19]

- Sworn testimony given by the Dock Board confirms that due to their compromised condition, these piles were a priority for and required replacement many months before arrival of the PAC ANTARES.[20]

- Correspondence records produced in this case definitely show that management level personnel within the Dock Board knew of these deficiencies since at least September 2017 – some 7 months before the incident.[21]

- On March 28, 2018, just two weeks before this incident, the M/V TORENIA experienced similar damage to its hull plating due to contact with the same steel ro-ro plates.[22]

- Despite its knowledge of these conditions since September 2017, and its knowledge that this condition had just damaged another vessel in this exact area, the Dock Board took no action whatsoever to correct these hazardous conditions.[23]

In the face of this, and other damaging evidence, the Dock Board has also adopted the position that even if the fender piles had the pre-existing damage and deterioration detailed in their own inspection reports, the piles still provided a sufficient buffer for the PAC ANTARES berthing. This baseless position is predicated upon the Dock Board's contention that there remained a sufficient structure of wood – albeit crushed, fractured, loose, and leaning – that, when considered in the aggregate, provided an adequate buffer for the PAC ANTARES. In support of this unfounded position, the Dock Board relies upon the opinion of a single fact witnesses,[24] who

---

[19] Exhibit J, Winn Deposition, Exhibit 100 (September Pile Inspection Report PORTOFNO 01238).
[20] Exhibit C, Wynn Deposition, 34:11-25 – 35:1-10; Exhibit I, Booker Deposition, 71:4-25; 72:1-16.
[21] Exhibit K, PORTOFNO 3026.
[22] Exhibit L, (PORTOFNO 1800-1801, PA0237-0241). The incident prompted the vessel to send a letter of protest, which was received by the Dock Board that same day, stating that the "berth has insufficient and dilapidated wooden fenders and protruding steel plate without fender near the corner of the plate where the ship's hull touched." And the damage to the TORRENIA's hull caused by the steel plates bears a striking resemblance to the damage sustained by the PAC ANTARES just 15 days later.
[23] Exhibit C, Wynn Deposition, 33:23-25; 34:1-9.
[24] Exhibit I, Deposition of Booker 148:12-20.

provided no basis, whatsoever, for this contention.  Indeed, the Port has offered no substantiation for this witnesses' opinion, and, notably, none of the Dock Board's experts have expressed alignment with this view.

Additionally, each of these arguments advanced by the Dock Board ignore the proverbial elephant in the room.  As originally installed, the piles at the incident location were some 85' in length, with greater than 90% of the wooden structure submerged below the water at the time of this incident, with some smaller portion designed to be buried into the sea bed.  Any meaningful opinion as to the piles' structural integrity and purported ability to act as an appropriate buffer for the vessel, necessarily required an inspection of the entire pile, the vast majority of which was under water.  However, in light of safety concerns due to extremely high river conditions, the Dock Board took the position that neither diving inspections nor removal of the piles could be effectuated until river conditions improved.

## V.    THE DOCK BOARD DESTROYS CRITICAL EVIDENCE

With litigation all but certain within hours of the incident,[25] the Dock Board had an absolute obligation to preserve this critical evidence, evidence which was exclusively within its custody and control. In light of the inaccessibility of the piles for inspection, the vessel interests placed the Dock Board on notice of its desire to be present during any repairs/removal of the piles. Specifically, in the days and weeks immediately following the incident, through counsel, and separately through direct contacts between retained experts for all parties, a series of requests were made to ensure that the vessel interests were notified and allowed to be present for any repair

---

[25] Exhibit M, (PORTOFNO 0873-0888). On April 12, 2018, the day of the incident, the PAC ANTERES interests issued a notice of claim to the Dock Board for damages arising out of this incident.   And on April 13, 2018, the Dock Board sent a letter to the vessel's agent providing notice of its potential claim against the vessel arising out of the same incident.

activities to the fender piles at the incident location.[26]  In response, on April 23, 2018, counsel for the Dock Board confirmed that the Port's engineers would notify the vessel interests' engineers of the commencement of repairs so they could be in attendance to inspect and document the condition of this critical evidence.[27]

However, in blatant disregard of its legal obligation and its express commitment, the Dock Board – utilizing its own personnel and equipment – removed and discarded the piles with no notice whatsoever to the vessel interests. Upon learning that this critical evidence had been destroyed, on June 22 and June 27, 2018, the undersigned wrote to the Dock Board, detailing the history of exchanges between the parties, the breach of its commitment to notify the vessel interests and allow their attendance and inspection of the piles, and the significant prejudice to future litigation resulting from their destruction of this key evidence.[28]  Nearly three years after the incident, the Dock Board still has provided no response or explanation for its actions.

The significance of this evidence cannot be overstated.  In its most basic terms, this case comes down to two competing positions as to how this incident occurred.  For its part, the Dock Board contends that this incident was caused by the actions of the vessel.   While it is Antares' position that this incident occurred due to significant deterioration and damage to the fender piles which did not afford protection from the steel plates.  The Dock Board was provided unrestricted access to the vessel, including all its appurtenances, systems and records.  In contrast, the vessel interests were denied access to the most critical evidence for its case, the fender piles.

The legal effect of the Port's spoliation is apparent; it denies Antares critical evidence at the heart of its case.  Specifically, it precludes the vessel interests from assessing the magnitude

---

[26] Exhibit N, O.
[27] Exhibit P.
[28] Exhibit Q, R.

and scope of deterioration and damage to the piles which was observed to the topside portion of the piles in the immediate area of the ro-ro plates.  An assessment of the piles' subsurface condition directly bears on their capacity to resist a berthing vessel, as detailed below.

- Piles with significant damage below the water – e.g. fully fractured or having significant subsurface deterioration or pre-existing damage – cannot transfer a portion of the load to the seabed as intended.

- Where there is no connection/support at the bottom, the pile would likely be loose, as the piles' connection would be limited to the deck area, allowing greater freedom of movement on contact with the vessel, limiting its capacity to resist the energy from a berthing vessel.

- Pile weight is designed to be supported by its embedment.  Where there is significant fracturing, wasting or deterioration below the water, the top connection experiences additional stress due to having to support or hold up the pile, which effectively hangs from the deck.

## VI. THE DOCK BOARD'S ACTIONS CONSTITUTE CLEAR SPOLIATION OF EVIDENCE

In the words of the Fifth Circuit, "[s]poliation of evidence is among the offenses for which a court may assess sanctions using its *inherent powers.*" *Union Pump Co. v. Centrifugal Tech., Inc.*, 404 Fed. App'x 899, 905 (5th Cir. 2010) (per curiam) (citing *Hodge v. Wal-Mart Stores, Inc.*, 360 F.3d 446, 449 (4th Cir. 2004)) (emphasis added). *See also, e.g.*, *Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 799 (N.D. Tex. 2011) (citing *Chambers v. NASCO*, 501 U.S. 32, 44 (1991)) ("A federal court has the inherent power to sanction a party who has abused the judicial process."). Spoliation is "the 'destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Ashton*, 772 F. Supp. 2d at 799 (quoting *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001)). To order sanctions for spoliation, the trial court must find: (1) the existence of a duty to preserve; (2) a culpable breach of that duty; and (3) resulting prejudice to the innocent party. *Id.* at 800 (collecting cases).

"The first factor in an adverse inference analysis is whether the party with control over the evidence had an obligation to preserve evidence at the time the evidence was destroyed." *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 2014 U.S. Dist. LEXIS 13307, at *97 (W.D. La. Jan. 27, 2014). A duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation. *Toth v. Calcasieu Parish*, 2009 U.S. Dist. LEXIS 16116, at *1 (W.D. La. Mar. 6, 2009) (citing *Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)).

This first element is clearly satisfied. Control over the fender piles (and indeed the steel plates) is not in dispute; indeed, it is conceded by the Dock Board.  As for the Dock Board's knowledge that this evidence was relevant to "pending or future litigation" this too is firmly established. The relevance of these piles is self-evident from their location and intended purpose in the context of this case.  Their relevance is further established by the allegations and claims made by the vessel interests (April 12, 2018), as well as counter claims advance by the Dock Board (April 13, 2018) for damages to the very piles it destroyed after the incident.  Finally, the Dock Board knew well that litigation was all but certain and imminent. This marine casualty resulted in the discharge of 2000 gallons of fuel oil into the Mississippi river.  Pursuant to the Oil Pollution Act of 1990, a unified command was established under the direction of the U.S. Coast Guard.  In accordance with the vessel's oil spill response plan, significant resources were engaged and deployed for response and cleanup activities.  These efforts continued for several weeks with millions of dollars expended by the vessel interests.   There can be no doubt that, from the earliest days, the Dock Board knew litigation was imminent.

As for the second element, the Dock Board's breach of its duty to preserve this critical evidence is undeniable.  It is undisputed that the Dock Board – utilizing its own personnel and

equipment – removed and disposed of the fender piles that were in the immediate area of the steel plates.  The destruction of this evidence was done without notice of any kind to the vessel interests and despite the vessel interest's requests for its preservation for inspection.  There can be no clearer case for breach of the preservation obligation.

As for the final element, the prejudice to Antares is as significant as it is palpable.  The Dock Board's actions have permanently denied Antares the ability to conduct a meaningful examination of the dilapidated fender piles and to present this evidence to the Court.  Where a party is left with "no direct, physical evidence" to prove its claim, prejudice has been found.  *See, e.g.*, *Ashton*, 772 F. Supp. 2d at 803 (citing *Victor Stanley v. Creative Pipe, Inc.*, 269 F.R.D. 497, 532 (D. Me. 2010)).  "Generally, the prejudice element is satisfied 'where a party's ability to present its case or to defend is compromised.'" *Id.* at 801 (quoting *Victor Stanley v. Creative Pipe, Inc.*, 269 F.R.D. 497, 532 (D. Me. 2010)).  Through the Dock Board's actions, Antares was denied the opportunity to inspect the subsurface condition of the fender piles in the immediate area of the ro-ro plates.  These actions have compromised Antares' ability to fully present its case.  Clear prejudice has been visited upon Antares as a result of the Dock Board's removal and destruction of these fender piles.

Finally, the Dock Board has demonstrated "bad faith," within the meaning of the jurisprudence, by its spoliation of the fenders piles.  As explained by the Western District of Louisiana:

> *Culpability is not established by any bright line test, but rather, analyzed on a case-by-case basis.*  Therefore, culpability ranges from bad faith or intentional destruction of evidence by a party, to the gross negligence of a party to preserve evidence once the party knew or should have known that litigation was imminent.

*Actos*, 2014 U.S. Dist. LEXIS 13307, at *115 (quoting *Premier Dealer Serv., Inc. v. Duhon*, 2013 U.S. Dist. LEXIS 166661 (E.D. La. 2013)) (emphasis in *Actos*).  The Fifth Circuit "has instructed

that an adverse inference jury instruction for spoliation," as Antares seeks here, "is appropriate where a showing is made that the malfeasant party 'intentionally destroyed important evidence in bad faith and did so because the [evidence was] unfavorable to that party.'" *Ashton*, 772 F. Supp. 2d at 801 (quoting *Whitt v. Stephens County*, 529 F.3d 278, 284 (5th Cir. 2008)). However, "[a] party's 'conscious disregard' of its obligations is sufficient to show a culpable state of mind" in the context of spoliation penalties. *In re Complaint of Hornblower Fleet, LLC*, No. 16-2468, 2018 U.S. Dist. LEXIS 209032, at *10 (S.D. Cal. Dec. 11, 2018) (citing *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 998 (N.D. Cal. 2012)). This culpable state of mind may also "be demonstrated by ordinary negligence." *Id.* (collecting cases). *See also Interlake S.S. Co. v. VanEnkevort Tug & Barge, Inc.*, No. 2:09-74, 2011 U.S. Dist. LEXIS 115929, at *19-20 (W.D. Mich. Oct. 7, 2011) (quoting *Beaven v. U.S. Dept. of Justice*, 622 F.3d 540, 544 (6th Cir. 2010)) ("The culpable state of mind factor is satisfied by a showing that the evidence was destroyed knowingly, even if without the intent to breach a duty to preserve it, or negligently."). As explained by the Second Circuit:

> It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently. The adverse inference provides the necessary mechanism for restoring the evidentiary balance. The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have detrimental rather than favorable should fall on the party responsible for its loss.

*Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quoting *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991)). *See also Menges v. Cliffs Drilling Co.*, No. 99-2159, 2000 U.S. Dist. LEXIS 8478, at *5-6 (E.D. La. June 12, 2000) (quoting *Nation-Wide Check Corp. v. Forest Hills Distribs.*, 692 F.2d 214, 217-18 (1st Cir. 1982)) ("[T]o restore the prejudiced party, an adverse inference 'places the risk of an erroneous judgment on the party that wrongfully created the risk.'").

**VII.   AN ADVERSE INFERENCE REGARDING THE CONDITION OF THE FENDER PILES IS AN APPROPRIATE REMEDY.**

"Courts have broad discretion in crafting a remedy that is proportionate to both the culpable conduct of the spoliating party and resulting prejudice to the innocent party." *Id.* (citing *Anadarko Petroleum Corp. v. Davis*, No. 06-2849, 2006 U.S. Dist. LEXIS 93594, at *27 (S.D. Tex. Dec. 28, 2006)). "In choosing the appropriate remedy, a court must ensure that it is 'no harsher than necessary to respond to the need to punish or deter and to address the impact on discovery.'" *Id.* (quoting *Rimkus*, 688 F. Supp. 2d at 618). Stated differently:

> [A]n appropriate sanction should "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."

*Id.* (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)).

"An 'adverse inference' is said to be 'the oldest and most venerable remedy' for spoliation." *Baggett v. Yamaha Motor Co.*, No. 3:06-184, 2008 U.S. Dist. LEXIS 134632, at *6 (S.D. Miss. Jan. 11, 2008) (quoting *United Medical Supply Co. v. U.S.*, 77 Fed. Cl. 257 (2007)). The Fifth Circuit has held that "[a] spoliation instruction entitles the jury to draw an inference that a party who intentionally destroys important [evidence] did so because [that evidence was] unfavorable to that party." *Russell v. U. of Texas of Permian Basin*, 234 Fed. App'x 195, 207 (5th Cir. 2007) (citing *Vick v. Tex. Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)).

Here, Antares seeks an adverse inference regarding the pre-existing condition of the piles in the area of the ro-ro plates at Nashville A.  Specifically, Antares seeks an adverse inference that the damage and deterioration to these piles, documented after the subject incident,[29] pre-dated the

---

[29] Exhibit H (PORTOFNO 08354 - 08359).

April 12, 2018 docking of the PAC ANTARES. The prayed-for inference, then, provides a certain "poetic justice" to the wrong faced by Antares in a manner that recognizes the harm done and the interests of justice to be served. *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 218-19 (1st Cir. 1982).

## VIII.   CONCLUSION

Defendant's destruction of physical evidence after it was clear that litigation was imminent reveals malfeasance along with negligence in its failure to preserve the dilapidated wooden fenders pulled from the berth known as "Nashville A." These fenders were unique and crucial evidence in this case, and without them, Antares faces clear prejudice in its attempt to prosecute its claims. The appropriate sanction for this bad faith behavior is an inference in Antares' favor that the damage and deterioration to these piles, documented after the incident, pre-dated the April 12, 2018 docking of the PAC ANTARES.

Respectfully submitted,

 /s/ H. Jake Rodriguez
H. JAKE RODRIGUEZ (La. #27867)
jake.rodriguez@wilsonelser.com
MICHAEL HAROWSKI (La. #30543)
michael.harowski@wilsonelser.com
ANTONIO J. RODRIGUEZ (La. #11375)
antonio.rodriguez@wilsonelser.com
**WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP**
650 Poydras St., Ste. 2200
New Orleans, LA 70130
Telephone: (504) 702-1710
Facsimile:  (504) 702-1715
*Counsel for Antares Maritime PTE, Ltd.*